# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMY M. STORRAR, ) | 1:10cv0443 DLB |
| ) | |
| ) | ORDER REGARDING PLAINTIFF'S |
| Plaintiff, ) | SOCIAL SECURITY COMPLAINT |
| ) | |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## BACKGROUND

Plaintiff Amy M. Storrar ("Plaintiff"), proceeding *pro se* and *in forma pauperis*, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Titles II and XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.

## FACTS AND PRIOR PROCEEDINGS[1]

On August 3, 2007, Plaintiff filed applications for DIB and SSI. AR 138-51, 156-83. She alleged disability since November 27, 2001, due to fibromyalgia, panic attacks, obesity and her right knee. AR 184-87, 188-95. After being denied initially and on reconsideration, Plaintiff

---

[1] References to the Administrative Record will be designated "AR," followed by the relevant page number.

1

requested a hearing before an Administrative Law Judge ("ALJ").  AR 96-100, 101-05, 107-08. On June 16, 2009, ALJ Stephen W. Webster held a hearing.  AR 20-61.  ALJ Webster denied benefits on October 20, 2009.  AR 7-19.  The Appeals Council denied Plaintiff's request for review on December 4, 2009.  AR 3-6.

Hearing Testimony

ALJ Webster held a hearing on June 16, 2009, in Fresno, California.  AR 20.  Plaintiff appeared with her attorney, Dennis Bromberg.  Vocational expert Judith Najarian also appeared and testified.  AR 22.

Plaintiff was born in 1976.  She is 5'6" and weighs about 230.  She is not married.  She lives with her two children, ages 15 and 2, in a mobile home.  AR 24-25.  She has a driver's license, and drives to the doctor, the store and her child's school.  She takes care of her personal grooming needs without help, including bathing and getting dressed.  She cooks and does laundry.  Her son helps her with the laundry.  She does not do any yard work.  AR 25-26.

Plaintiff testified that she watches TV two to three hours a day.  Her attention span is very short.  Her 15-year-old son helps her take care of the younger child.  Plaintiff does not visit with friends or family.  She does not go to movies or attend church.  AR 26-27.

Plaintiff has a high school diploma.  She also completed a few college credits and received schooling for phlebotomy.  She received her "CNA" in 1993 and her phlebotomy license in 1997.  Her licenses are current.  AR 27-28.  She last worked in 2004 at a temporary job registering people to vote.  Since 2001, she has not done any other work.  AR 28-29.

Plaintiff testified that she has fibromyalgia, depression, and panic disorder.  She also has a torn ACL in her right knee, but they cannot perform surgery because of her weight.  She recently had gastrointestinal bypass surgery and hernia surgery.  AR 29-30.

Plaintiff sees "Dr. Verman" for her physical problems every month.  She was taking Ultram and Soma for her fibromyalgia, but had to stop.  No one told her that she couldn't drive with the medications and she received a DUI.  She is not allowed to take anything for her fibromyalgia pain.  Plaintiff also goes to Fresno County Behavioral Health for medication and sees Dr. Kathryn Cannon every week.  AR 30-31.

Plaintiff testified that she can sit for 30 minutes, or maybe 15 minutes, for mental reasons. She can stand about 15 minutes because of her knee. She cannot walk much because of her fibromyalgia. She can probably walk about 15 or 20 minutes. AR 31-32. It is hard for her to lift because of fibromyalgia. The fibromyalgia also brings on anxiety and she has to fight herself to go places and to do things. She has a social phobia of what people are going to think of her. She takes Seroquel and Paxil for her psychological problems, but they do not help. AR 32-33.

Plaintiff testified that she tried to commit suicide in 1997. She was afraid to get help because she did not want to lose her son. She still feels like that and fights off the temptation. She has never had a problem with illegal drugs or alcohol. AR 34-35.

In response to questions from her attorney, Plaintiff testified that the heaviest amount of weight she can lift is two pounds. She further testified that she goes grocery shopping and puts items from the shelves into her cart. She can lift a little box of sugar and a half gallon of milk, which is about eight pounds. She doesn't lift anything heavier. AR 36-37.

Plaintiff testified that she weighed 300 pounds before her bypass surgery. At that time, she could walk from inside to outside and back and forth from the restroom. It would take her about three minutes. Before her surgery, she could stand for about three minutes and sitting was a problem because of anxiety and pain. She has pain in her lower back, shoulders, arms and hands. AR 37-39. When she returned home after bypass surgery, she was able to walk, but had severe pain in her incision. AR 39-40. Plaintiff had lost 70 pounds since August and her goal weight is 150 for knee surgery. AR 40-41.

Plaintiff testified that she falls about once a week because of her knee. She loses her balance, her knee buckles inward and she falls. She always has swelling and pain in her right knee. She uses a knee brace and an ace bandage, but there is nothing that helps her pain. She also elevates her right leg every day for three hours at one time. She wears her knee brace almost every day. AR 42-43.

Plaintiff clarified that she received a DUI for prescription drugs. They did not take her license, but there is a pending DUI case. AR 43-44.

1    Plaintiff had hernia surgery two weeks before the hearing. She has taken Paxil since
2 2008 and Seroquel for about eight weeks. She has tried different medications, but nothing has
3 worked. AR 44-45.

4    Plaintiff testified that it is very hard for her to sleep. She goes to bed at 9:30 or 10:00,
5 but will not fall asleep until 6:00 in the morning. She lies in bed from 10:00 to 6:00 about two to
6 three times a week. She has racing thoughts during the day and night. AR 46-47.

7    Plaintiff testified that it is hard for her to eat, but she forces herself to eat. She also has
8 panic attacks. When she has a panic attack, she sweats a lot and feels nauseated. AR 47-48.
9 She likes to be alone, isolated. She struggles with thoughts of suicide every day. It is impossible
10 for her to stay on task or focus. She watches TV, including news, cartoons and movies with her
11 kids. She cannot follow a movie from the beginning to the end. She has to watch the movie
12 about four or five times before she actually gets any part of it. She can watch for about five
13 minutes before losing focus. AR 50-51.

14    Plaintiff explained that her 2-year old is at home, not daycare. Her 15-year-old is home
15 for summer. On a typical day, she gets up and feeds her child and herself. She watches her child
16 play for about two hours. She will also play with her child. She does laundry and vacuums once
17 a week. She also washes dishes. The most difficult chore is shopping. Her mom usually goes
18 with her. In the house, her most difficult chore is taking a shower. It is difficult for her because
19 she is no sure if she should be taking a shower or not taking a shower or if she is doing it right.
20 She questions every decision she makes. From a physical standpoint, getting out of bed is the
21 most difficult chore. It is as difficult as vacuuming, sweeping and doing laundry. AR 51-54.

22    The VE also testified in response to questions. The VE testified that Plaintiff would have
23 transferable skills from her CNA, but not phlebotomy. For the first hypothetical, the ALJ asked
24 the VE to assume a person of Plaintiff's age, education and work history. The ALJ asked the VE
25 to further assume that this person could lift 20 pounds occasionally, 10 pounds frequently, could
26 sit, stand, and/or walk six out of eight hours, occasionally could crouch, squat, and climb, but
27 could not kneel or crawl. This person also would be limited to simple three and four-step job
28 instructions. The VE testified that this person could not do any of Plaintiff's past relevant work,

4

but there would be other jobs in the regional or national economy that this person could perform at the light level. One example is packing line worker, which is light, SVP 2, with 31,574 jobs in California. Other jobs include greeter, with 2,230 jobs in California, and toll collector, with a reduction to 18,990 jobs in California. The VE indicated that her testimony was in conformity with the Dictionary of Occupational Titles. AR 56-58.

For the second hypothetical, the ALJ asked the VE to assume the same factors as in the first hypothetical and also to assume this person would have occasional problems maintaining attention, concentration and pace. The VE testified that this person could not perform Plaintiff's past relevant work or any other work in the economy. AR 58.

For the third hypothetical, Plaintiff's counsel asked the VE to assume the same person as in first hypothetical with concentration that was limited to one hour increments. The VE testified that this person could not do any past relevant work or any other work in the economy. The VE explained that a person needs to be able to do tasks for at least two hours at a time. AR 59.

At the conclusion of the hearing, the ALJ left the record open for two weeks to obtain additional records from "Dr. Verman" and Dr. Cannon. AR 60.

Medical Record

In September 1997, Plaintiff was admitted to University Medical Center for altered mental status secondary to benzodiazepines. Her family reported that she had been in her room for about four days with possible heavy alcohol and drug use. On arrival, her Glasgow coma scale was 14 and she was given charcoal and a cathartic. A psychiatric consult found Plaintiff competent at discharge. She denied any suicidal ideations, history of mood disorder and history of alcohol abuse. She was discharged home in a stable, improved condition. AR 230-31.

In March 2002, Plaintiff attempted suicide while pregnant. She took an unknown quantity of children's vitamins. She was diagnosed with depression. AR 237-38, 439-59.

On October 10, 2004, Mark S. Giesbrecht, M.D., completed a crisis assessment. Plaintiff was admitted pursuant to a 5150 after telling her mother that she was thinking of killing herself. Plaintiff denied drug and alcohol use, but her mother reported that Plaintiff had been drinking

5

hard liquor for two weeks. Dr. Giesbrecht diagnosed Plaintiff with bipolar disorder NOS and assigned her a GAF of 57. Due to her continued instability of mood and an inability to commit to no harm, Plaintiff appeared likely to require hospitalization for monitoring and stabilization. AR 426-29.

On September 16, 2005, Plaintiff complained of right knee pain. She was to obtain an MRI. AR 270.

Plaintiff did not show for her appointment at Sequoia Community Health Centers on October 31, 2005. AR 269. On November 1, 2005, Plaintiff's mother reported to the health center that Plaintiff had been "missing" for four days. Plaintiff's MRI was rescheduled. AR 269. A right knee MRI on November 11, 2005, revealed a complete rupture of the anterior cruciate ligament. Plaintiff's medial and lateral menisci also appeared abnormal. AR 278. She was denied orthopedic surgical intervention because she had a high BMI at a height of 5'5" and a weight of 200 pounds. AR 384.

In March 2007, a left ankle x-ray revealed several small bony fragments and diffuse soft tissue swelling. AR 279.

On May 29, 2007, Plaintiff did not show for her appointment at Sequoia Community Health Centers. It was noted that she had multiple no shows. AR 249, 250. A dismissal warning letter was given to Plaintiff on July 26, 2007. AR 248.

In June 2007, Plaintiff was diagnosed with a right ACL tear. She was to return for evaluation of treatment, including knee surgeries and need for weight loss. AR 234.

In July 2007, Plaintiff had morbid obesity and was referred for gastric bypass. Her treatment provider also noted "FMS/low back pain" and a pain management referral. AR 247.

On August 6, 2007, Plaintiff reported falling down and hitting her right knee. She wanted disability due to her knee. She also asked about possible fibromyalgia syndrome. AR 245.

In August 2007, Plaintiff was referred for consultation regarding gastric bypass and pain management. AR 244, 246.

6

On August 24, 2007, Plaintiff saw Dr. Zafar Parvez for a gastric bypass consultation. Plaintiff reported feeling good, but did not like the heavy person she was. Following examination, Dr. Parvez indicated that Plaintiff was morbidly obese and recommended bariatric surgery. He also indicated that a psychiatric evaluation needed to be completed which stated Plaintiff was mentally stable. AR 336-37.

On September 21, 2007, Plaintiff reported "panic attacks" and pain all over. She also said that she had fibromyalgia and knots in her back. The provider noted that Plaintiff was there "to attempt to get diagnosis of fibromyalgia and to get disability forms completed." Plaintiff expressed a desire to have her care transferred from her regular physician. AR 243.

On October 8, 2007, Plaintiff was to be dismissed from care at Sequoia Community Health Centers for no shows. AR 342.

On October 12, 2007, Rustom F. Damania, M.D., completed a consultative evaluation. Plaintiff complained of total body pain, low back pain radiating to the right leg, right knee pain, psychiatric pain and left ankle pain due to a fracture. She also complained of depression, anxiety and panic attacks. Plaintiff reported having two children and doing household chores.

On examination, Dr. Damania noted that Plaintiff was morbidly obese. Her coordination, station and posture were normal. Her range of motion was within normal limits and her straight leg raising was normal. She had no paravertebral muscle spasms, tenderness, crepitation, effusion or deformities. She had positive trigger points on the right and left lower cervical, right and left supraspinatus, right and left infraspinatus and right hip. Her power was 5/5 in both upper and lower extremities. She had normal muscle bulk and tone with no atrophy.

Dr. Damania diagnosed Plaintiff with morbid obesity, fibromyalgia by history, right knee pain with possible internal derangement and psychiatric problems. He opined that Plaintiff should be able to lift and carry 20 pounds occasionally and 10 pounds frequently. She should be able to stand and walk for six hours out of a normal eight-hour workday with normal breaks and sit without restriction. She had no postural limitations to bending or stooping, but was restricted from frequent crouching, kneeling or squatting due to right knee problems. She had no

manipulative, visual or communicative impairments. Due to her knee problems, workplace environmental limitations to climbing and balancing applied. AR 299-303.

On October 12, 2007, Shireen R. Damania, M.D., completed a consultative psychiatric examination. Plaintiff reported taking Lexapro and Aciphex for acid reflux. She also stated that she was being worked up for Fibromyalgia by her current physician. When asked about her symptoms, Plaintiff responded that she has severe back pain going down her right leg, but she chooses not be on any pain medication.

Plaintiff indicated that she had never seen a therapist or psychiatrist. When asked if she would consider seeing one, Plaintiff stated that she did not have time. On a typical day, she takes her son to school and picks him up at 3:30 p.m. She spends the rest of the day caring for her one-year-old daughter. She cooks, cleans and watches movies in the evening. She goes to the supermarket and takes care of all of her activities of daily living.

On mental status examination, Plaintiff was mildly anxious, but smiled and laughed appropriately during the course of the interview. Her affect was broad and appropriate to thought content and situation. She denied any suicidal ideations and her impulse control and frustration tolerance were within normal limits. She had no evidence of a thought disorder, her memory was intact and her attention span with within normal limits. Dr. Damania diagnosed Anxiety Disorder Not Otherwise Specified and rated her Global Assessment of Functioning ("GAF") as 61-65. Dr. Damania opined that Plaintiff had good interpersonal and social skills with no difficulties in memory, concentration, persistence or pace. She could understand, carry out and remember three– and four-step job instructions in a work like setting, but would have difficulty with complex and detailed job instructions. She was able to respond appropriately to coworkers, supervisors and the public. She also was able to respond appropriately to usual work situations and deal with changes in a routine work setting with normal supervision. AR 304-07.

On October 26, 2007, Carmen E. Lopez, M.D., a state agency medical consultant, completed a Physical Residual Functional Capacity Assessment form. Dr. Lopez opined that Plaintiff could lift and/or carry 50 pounds occasionally, 25 pound frequently, could stand and/or walk about 6 hours in an 8-hour workday, could sit about 6 hours in an 8-hour workday and push

1  and/or pull without limitation.  She had no postural, manipulative, visual, communicative or
2  environmental limitations.  AR 308-12.

3        On October 29, 2007, Evangeline A. Murillo, M.D., a state agency medical consultant,
4  completed a Psychiatric Review Technique form.  Dr. Murillo opined that Plaintiff did not have
5  a severe mental impairment.  Although Dr. Murillo noted the presence of an anxiety disorder,
6  Plaintiff had no functional limitations.  AR 316-26.

7        Beginning in December 2007, Plaintiff began receiving treatment from Dr. Yash Verma.
8  AR 465.

9        On August 1, 2008, Plaintiff complained of anxiety.  Her Paxil was increased.  AR 469.

10       On February 8, 2008, Plaintiff reported to Dr. Verma that she had fibromyalgia and all
11 the medications had failed.  AR 471.

12       On June 26, 2008, Kathryn A. Cannon, Ph.D., a clinical psychologist, wrote a letter to the
13 state agency.  Dr. Cannon indicated that Plaintiff had been in individual therapy since March
14 2008.  Per Dr. Cannon, Plaintiff had severe symptoms of Posttraumatic Stress Disorder, Major
15 Depression and Panic Disorder and was highly anxious, fearful and avoidant.  Dr. Cannon
16 opined that Plaintiff's panic attacks and social phobia would interfere with any attempt to return
17 to the work force or engage in training.  Dr. Cannon further opined that Plaintiff's depressed
18 mood, sleep and appetite disturbance, fatigue, poor self esteem and problems concentrating and
19 remembering would interfere with adequate functioning at work or school.  Dr. Cannon
20 anticipated that with continued therapy and medication, Plaintiff ultimately would be ready to
21 return to the work force.  AR 464.

22       On August 20, 2008, Dr. Josefina Collado of Fresno County Mental Health completed a
23 medication evaluation.  Dr. Collado diagnosed Plaintiff with bipolar disorder and depression
24 NOS.  She assigned Plaintiff a GAF of 55.  AR 421.

25       On August 27, 2008, Plaintiff underwent a gastric bypass.  AR 461-63.

26       On October 1, 2008, Plaintiff reported to Dr. Collado that she was better with
27 medications.  She was to start Klonopin as the two previous medications were not controlling her
28

1  moods. Plaintiff also reported panic attacks and variable sleeping patterns. Her mood was
2  anxious and irritable. AR 419.
3   On February 24, 2009, Plaintiff saw Dr. Collado and reported that Abilify and Klonopin
4  made her drowsy and she discontinued them after two weeks. She complained of increasing
5  panic attacks and mood swings. She requested sleeping pills. On examination, she was alert,
6  with organized thought processes and with normal speech, orientation, insight and judgment.
7  She had an impaired memory and depressed mood. Dr. Collado diagnosed bipolar disorder. AR
8  418.
9   On March 16, 2009, Plaintiff complained of pain due to fibromyalgia. The provider
10 prescribed Soma, but did not diagnose fibromyalgia. AR 467.
11  On July 17, 2009, Plaintiff complained to Dr. Verma of back pain and lightheadedness.
12 Following examination, Dr. Verma assessed multiple symptoms with no objective findings and
13 noted hypochondria. AR 465.
14  ALJ's Findings
15  The ALJ found that Plaintiff had not engaged in substantial gainful activity since
16 November 27, 2001. She had the severe impairments of obesity, fibromyalgia, right knee
17 derangement, panic disorder and bipolar disorder. Despite these impairments, the ALJ
18 determined that Plaintiff retained the residual functional capacity ("RFC") to lift and/or carry 20
19 pounds occasionally and 10 pounds frequently and to sit, stand and/or walk six hours out of an 8-
20 hour work day. She occasionally could crouch and squat, but could not kneel or crawl. She was
21 limited to simple 3-4 step job instructions. With this RFC, the ALJ concluded that Plaintiff
22 could not perform her past relevant work, but could perform other work that exists in the
23 national economy. AR 12-18.

## SCOPE OF REVIEW

25  Congress has provided a limited scope of judicial review of the Commissioner's decision
26 to deny benefits under the Act. In reviewing findings of fact with respect to such determinations,
27 the Court must determine whether the decision of the Commissioner is supported by substantial
28 evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla,"

1   *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

**REVIEW**

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(g), 416.920 (a)-(g). Applying the process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since her alleged onset date; (2) has an impairment or a combination of impairments that is considered "severe" (obesity, fibromyalgia, right knee derangement, panic disorder and bipolar disorder) based on the requirements in the Regulations (20 C.F.R. §§ 404.1520(c), 416.920(c)); (3) does not have an

impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) she could not perform her past relevant work; but (5) could perform other jobs in the national economy. AR 12-18.

Here, Plaintiff contends that the ALJ erred by rejecting the opinion of Dr. Cannon. Plaintiff also objects to the opinion of her treating physician, Dr. Verma. Additionally, she references evidence from "Dr. Middleton." Opening Brief, p. 2.

# **DISCUSSION**

A.   Medical Opinion of Kathryn Cannon, Ph.D.

Plaintiff claims that when she "went to court they threw [Dr. Cannon's] decisions out." Opening Brief, pp. 1-2. The Court construes this claim as a contention that the ALJ improperly rejected the opinion of her treating psychologist, Dr. Cannon.

Treating physicians are owed considerable deference.[2] *Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir.2001). However, their opinions can "be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.* (internal quotation marks omitted). The "reasons must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (internal quotation marks omitted). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Id.* at 1156.

Here, the ALJ considered Dr. Cannon's letter and provided specific and legitimate reasons for assigning her opinion little weight. AR 16. First, the ALJ acknowledged Dr. Cannon's statements regarding Plaintiff's post-traumatic stress disorder, major depression and panic disorder. The ALJ also noted Dr. Cannon's opinion that Plaintiff's symptoms interfered with any attempt to return to the work force or engage in training. AR 16, 164. However, the ALJ rejected this opinion because Dr. Cannon's letter listed only diagnoses and lacked "all signs and bases for disability." AR 16. The ALJ further noted that Dr. Cannon's opinion was not supported by any objective findings or explanation and her conclusions were vague, conclusory,

---

[2]The rule regarding treating physicians encompasses treating psychologists as well as medical doctors. *McAllister v. Sullivan*, 888 F.2d 599, 602 n. 3 (9th Cir.1989).

and unreliable. AR 16. A treating physician's opinion that is conclusory and brief and lacks the support of clinical findings may be rejected by an ALJ. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); s*ee also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ properly discounted or assigned minimal weight to treating physician opinions that were unsupported by objective evidence and that lacked substantive medical findings); *Holohan v. Massanari,* 246 F.3d 1195, 1202 n. 2 (9th Cir. 2001) (stating that a physician's opinion may be "entitled to little if any weight" where the physician "presents no support for her or his opinion"); *Burkhart*, 856 F.2d at 1339 (ALJ properly rejected treating physician opinion where it was unsupported by medical findings, personal observations or test reports). Dr. Cannon provided no supporting treatment records, findings, test results, clinical techniques or evaluation records to support her opinion.[3] Thus, the ALJ did not commit error in rejecting Dr. Cannon's statements because they were conclusory and were unsupported by clinical findings.

Given the lack of objective findings, the ALJ surmised that Dr. Cannon's opinion appeared based on Plaintiff's subjective complaints. AR 16. It is not error for an ALJ to discount a treating physician's opinion that is based on a claimant's subjective complaints. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009). Indeed, when the record supports the ALJ's discounting of the claimant's credibility, the ALJ is free to disregard a doctor's opinion premised on the claimant's subjective complaints. *See Tonapetyan v. Halter,* 242 F.3d 1144, 1149 (9th Cir.2001); *Fair v. Bowen,* 885 F.2d 597, 605 (9th Cir. 1989) (ALJ did not err in disregarding physician's opinion that was premised on claimant's properly discounted subjective complaints). In this case, Plaintiff has not challenged the ALJ's determination that her allegations of disability were not entirely credible. AR 17.

---

[3]There is no indication that the ALJ had any duty to further develop the record regarding Dr. Cannon's opinion. When the evidence is ambiguous or "the record is inadequate" to allow for proper evaluation of the evidence, the ALJ has a duty to develop the record. *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir.2001). The ALJ may discharge this duty in one of several ways, including subpoenaing claimant's doctors, submitting questions to claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record. *Id.* Here, the ALJ discharged any duty to develop the record by keeping the record open after the hearing to allow supplementation with records from Dr. Cannon. AR 60.

The ALJ also discounted Dr. Cannon's statements because they did not contain any functional limitations useful in assessing Plaintiff's residual functional capacity. The ALJ rejected Dr. Cannon's suggestion that Plaintiff could not work because it was a determination reserved to the Commissioner. AR 16. "Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Tonapetyan*, 242 F.3d at 1148. The law reserves the disability determination to the Commissioner. *McLeod v. Astrue, — F.3d —, 2011 WL 347133 (9th Cir. Feb. 4, 2011)* (noting that an impairment is a purely medical condition, but a disability is an administrative determination of how an impairment affects ability to engage in gainful activity).

The ALJ further found no evidence of longitudinal treatment by Dr. Cannon, stating there was "no indication how frequently she has seen the claimant and treatment is very recent." AR 16. The record reflects that Dr. Cannon apparently treated Plaintiff for the period between March 2008 to June 2008. AR 16, 464. Dr. Cannon provided no information as to how many contacts she had with Plaintiff during that time. The factors an ALJ must consider in determining the weight to give a medical opinion include: the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Orn v. Astrue*, 495 F.3d 625, 631-33 (9th Cir. 2007). Thus, the ALJ correctly considered the longitudinal treatment relationship between Plaintiff and Dr. Cannon.

In addition, the ALJ discounted Dr. Cannon's opinion because it was inconsistent with the opinion of Dr. Shireen Damania, the consultative examiner. AR 16. "Where the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir.1995). Here, the ALJ found Dr. Damania's opinion to be well-supported. AR 16. The record demonstrates that

1  Dr. Damania's opinion was based on independent clinical findings, whereas Dr. Cannon's
2  opinion was not supported by any clinical records or objective findings.  AR 304-07, 464.
3        Based on the above, the ALJ provided specific and legitimate reasons, supported by
4  substantial evidence, for assigning little weight to Dr. Cannon's opinion.

6  B.      <u>Medical Opinion of Dr. Verma</u>
7        Plaintiff appears to challenge the opinion of her treating physician, Dr. Yash Verma,
8  asserting that Dr. Verma did not believe in her diagnosis and called her a hypochondriac.
9  Opening Brief, p. 2.  In 2009, Dr. Verma assessed Plaintiff with "multiple symptoms with no
10 objective findings" and hypochondria.  AR 465.
11       To the extent that Plaintiff is seeking a determination that her physician erred, this is not
12 the role of the district court in social security cases.  District courts have jurisdiction to review
13 the Commissioner's denial of benefits.  42 U.S.C. § 405(g).  In such instances, the court's role is
14 limited to determining whether the ALJ's findings are supported by substantial evidence and
15 whether the proper legal standards were applied.  *See DeLorme v. Sullivan*, 924 F.2d 841, 846
16 (9th Cir. 1991).  Therefore, this Court does not make a determination regarding the correctness
17 of Dr. Verma's opinion.
18       Insofar as Plaintiff argues that the ALJ improperly relied on Dr. Verma's opinion, this
19 argument is without merit.  It was proper for the ALJ to consider Dr. Verma's treatment records.
20 AR 14.  Indeed, the medical opinion of a claimant's treating physician is entitled to "special
21 weight."  *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988).  Reliance on the opinion of the
22 treating physician is based not only on the fact that he is employed to cure but also on his greater
23 opportunity to observe and know the patient as an individual.  *Magallanes*, 881 F.2d at 751.
24 Here, Dr. Verma treated Plaintiff from December 2007 through July 2009.  AR 465-74.
25       However, the ALJ did not rely primarily on Dr. Verma's opinion that Plaintiff had
26 multiple symptoms with no objective findings and hypochondria.  Rather, the ALJ relied on the
27 independent clinical findings of both consultative examiners, Dr. Rustom Damania and Dr.
28 Shireen Damania, in assessing Plaintiff's residual functional capacity.  AR 14-17.  A

1 consultative examiner's opinion constitutes substantial evidence because it rests on an
2 independent examination. *Tonapetyan*, 242 F.3d at 1149 (contrary opinion of examining source
3 provided "specific and legitimate reason" for rejecting opinion of a treating source); *Andrews*, 53
4 F.3d at 1041 (opinion of a nontreating source may be substantial evidence).

5       Based on the above, the ALJ did not err in his consideration of Dr. Verma's opinion.

6 C.     <u>Evidence from Dr. Middleton</u>

7       As a final matter, Plaintiff asserts that she has received treatment from Dr. Middleton, a
8 medication doctor who knows her diagnosis and the reason she cannot work. Opening Brief, p.
9 2. The Court construes Plaintiff's assertion as an argument that she has additional medical
10 records or evidence supporting her disability claim.

11       In order to merit a remand, the claimant must show that the new evidence is material, i.e.,
12 relevant, probative, and likely to change the outcome of the case, and the claimant must also
13 demonstrate good cause for not having incorporated the new evidence into the administrative
14 record. *See* 42 U.S.C. § 405(g). To be material under section 405(g), the new evidence must
15 bear directly and substantially on the matter in dispute. *Mayes v. Massanari*, 276 F.3d 453, 462
16 (9th Cir. 2001). The claimant additionally must demonstrate that there is a "reasonable
17 possibility" that the new evidence would have changed the outcome of the administrative
18 hearing. *Id.* A claimant does not meet the good cause requirement by merely obtaining a more
19 favorable report once her claim has been denied. *Id.* at 463. To demonstrate good cause, the
20 claimant must establish that the new evidence was unavailable earlier. *Id.*

21       Here, Plaintiff has failed to meet her burden regarding consideration of new evidence.
22 As a practical matter, Plaintiff failed to submit any records or opinions from Dr. Middleton. This
23 failure prevents the Court from determining whether the evidence is material to her condition
24 during the disability period or whether there is a reasonable possibility that the new evidence
25 would have changed the outcome of the administrative hearing. Thus, Plaintiff is not entitled to
26 remand for consideration of any "new evidence" from Dr. Middleton.[4]

27 ────────────

28     [4] While this evidence may be material to a new application for benefits, Plaintiff has not established that it is material to her current claim. Plaintiff is not precluded from submitting a new application.

**CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Amy M. Storrar.

IT IS SO ORDERED.

**Dated:   March 5, 2011**                           **/s/ Dennis L. Beck**
                                                    UNITED STATES MAGISTRATE JUDGE